**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Dane Chisholm,                                                    Case No. 3:16CV2849

                Plaintiff

      v.                                                    **ORDER**

St. Marys City School District
Board of Education, *et al.*,

                Defendant

This is a gender discrimination case.

Plaintiff Dane Chisholm, a former St. Marys Memorial High School football player, alleges that his coach, defendant Paul Douglas Frye, sexually harassed him. He claims that Frye regularly insulted him, calling him a "pussy" and other derogatory terms, and that these insults targeted his masculinity. He also brings claims related to Frye's hiring and an internal complaint he and others made about Frye.

Chisholm alleges defendant St. Marys City School District Board of Education (the Board) discriminated against him under Title IX, 20 U.S.C. §§ 1681, *et seq.* He also claims that the Board, Frye, St. Marys Superintendent Shawn Brown, and St. Marys Athletic Director James Hollman violated his constitutional rights to equal protection and substantive due process.

Chisholm also raises state law claims. He brings claims against all defendants for intentional and negligent infliction of emotional distress and "gross negligence, bad faith, reckless, wanton and intentional conduct." Finally, he raises a negligent hiring claim against the Board.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367(a).

Now pending are two motions for summary judgment: the Board, Brown, and Hollman's motion for summary judgment (Doc. 43) and Frye's motion for summary judgment (Doc. 44). For the following reasons, I grant the motions.

## Background

Frye became the St. Marys head football coach in January, 2014, after previously coaching there from 1999 through 2010. (Doc. 45-6 at 1, ¶ 1).

### A. Frye's 2013 Rehire

Brown led the late-2013 search for a new football coach that resulted in Frye's rehire. As Superintendent, Brown would recommend a candidate to the Board, which would vote on the recommendation. (*See* Doc. 40 at 64).[1]

In his search, Brown sought a candidate who could restore success to the St. Marys football program after several struggling seasons. (*See* Doc. 40 at 102). He pursued Frye because Frye was successful previously at St. Marys and in his then-current position in nearby Wapakoneta. (*Id.*). Frye coached winning teams, involved players in the community, and garnered college scouts' attention. (*Id.* at 100).

Frye's record was not unblemished. He had a reputation for being tough on his players, including using profanity and calling them names. This resulted in complaints from players and parents as well as disciplinary action against Frye, including:

- A 1995 disciplinary letter from the Superintendent of Frye's then-employer, Bucyrus City Schools, for cussing at a player (*see* Doc. 40 at 13);

---

[1] Typically, the Athletic Director would interview coaching candidates and recommend a selection to the Superintendent. Brown testified that because Hollman was in his first year as Athletic Director at the time of the football coach search, and due to the football coaching role's high-profile nature, he decided to conduct the search himself. (*See* Doc. 40 at 62-64).

- A 1999 complaint, which Hollman[2] and two other assistant coaches wrote, to the Board that Frye cussed too much at players and allowed them to play through injuries (*see* Doc. 35 at 34-36);

- A 1999 St. Marys coaching evaluation instructing Frye to refrain from cussing or using degrading language toward players (*see* Doc. 40 at 46-47);

- A 2012 Wapakoneta assistant coach's audio recording of Frye swearing at players and calling them names such as "losers," "dumbasses," "worthless," and "pussies" (*see id.* at 39);

- Statements Wapakoneta players made to police in response to the 2012 audio recording (*see id.* at 183);

- A written reprimand from the Wapakoneta Superintendent in response to the 2012 audio recording (*see id.* at 41); and

- A 2013 consent agreement with the Ohio Department of Education requiring Frye to submit quarterly reports about his behavior and treatment of students throughout the 2014-15 season. (Doc. 40-1 at 6-10).

Despite his disciplinary history, Frye had his supporters. For example, Bucyrus parents wrote a letter supporting Frye and his methods in response to the 1995 reprimand. (*See* Doc. 45-6 at 13-15). Likewise, the Bucyrus principal and athletic director wrote letters of recommendation to Frye's future employers. (*See id.* at 16, 18). Also, Frye won Ohio District III Coach of the Year in 2001 during his first St. Marys tenure. (*See id.* at 19).

Brown admits knowing about some, but not about all, of Frye's disciplinary record. He considered the complaints against Frye resolved because Bucyrus, St. Marys, and Wapakoneta continued to employ him for, respectively, approximately four (*see* Doc. 40 at 21), ten (*id.* at 95),

---

[2] Hollman was an assistant coach to Frye during the 1999 season at St. Marys. Hollman eventually quit that job because of the conduct cited in his complaint. (Doc. 35 at 31-32). He returned to St. Marys in 2000 and coached under Frye from that time until Frye left St. Marys. (*Id.* at 29-30).

and two (*id.* at 45) years. He acknowledged that that he neither requested nor reviewed Frye's prior coaching evaluations or his personnel file. (*Id.* at 48-49).

Brown explains that he took steps to investigate Frye's record. He spoke with both the previous St. Marys Superintendent (who wrote the 1999 evaluation) and the Wapakoneta Superintendent about Frye. The St. Marys Superintendent told Brown that he thought hiring Frye was a good decision. (*Id.* at 48). The Wapakoneta Superintendent told Brown about the audio recording but did not supply additional information. Frye disclosed the consent decree to Brown in a pre-interview meeting about the coaching position. (*Id.* at 77).

During the hiring process, three parents, including Dave Lininger (whose son, Reid Lininger, also has a lawsuit pending against the defendants)[3] encouraged Brown to recommend Frye to the Board. (*Id.* at 70). Yet, Brown received emails from at least two community members expressing concern about hiring Frye. (*See id.* at 92-94, 128-30; Doc. 40-1 at 12-15).

Brown interviewed only Frye for the head coaching job. After the interview and reviewing Frye's information, Brown recommended Frye for the role. (*See* Doc. 40 at 69-70).

Hours before to the meeting when the Board would vote on the head coaching job, a Board member received information about Frye's record, including the Wapakoenta recording. (*See* Doc. 40-1 at 18). The Board members convened an executive session to discuss the information. In the meeting's public session, a community member spoke out with concerns about Frye's background. (Doc. 40 at 85-87).

Despite the concerns raised at the Board meeting, the Board approved Frye for the head coaching job. In light of the concerns about Frye's background, Hollman, and, occasionally, Brown, monitored his behavior. (Doc. 40 at 57).

---

[3] *See Lininger v. St. Marys City Sch. Dist. Bd. of Educ.*, No. 3:16-CV-02853.

## B. Chisholm's Career and Frye's Coaching

Chisholm began playing football for St. Marys before Frye's rehire. His junior year season was Frye's first back at St. Marys. (*See* Doc. 33 at 11).

Chisholm had disciplinary issues while playing under Frye. For example, officials removed Chisholm from a game when he punched an opposing player. (*See* Doc. 35 at 125). Later that school year, Frye dismissed Chisholm from the team for smoking. (*Id.* at 28). After Chisholm begged Frye to reconsider, he let him rejoin the team. (*Id.* at 28-29).

Despite these problems, Frye named Chisholm a team captain going into Chisholm's senior year. (Doc. 33 at 20, 28). But, according to Frye, "Chisholm's attitude declined very quickly during his senior year after he started sharing playing time with a sophomore." (Doc. 45-6 at 3, ¶ 9).

Frye regularly yelled at his players, including Chisholm, using inflammatory, and often vulgar, language. (Doc. 44-1 at 10). Frye and his assistant coach (and son) Bo Frye called Chisholm and his teammates names, including "cancer," "dumb-ass", "loser", and "pussy." (Doc.33 at 164, 170-71). The two coaches called Chisholm one of these names almost daily. (*Id.* at 164).

Chisholm also alleges that Frye created an environment "where players were constantly pressured to play with injuries." (Doc. 1 at 2, ¶ 2). Injured players reported to one of two assistant coaches, who "determine[d] whether [the player should] go to the trainer, and the trainer [would] determine [whether the player should] go to the doctor." (Doc. 33 at 151).

Chisholm testified that, whenever he reported an injury to the assistant coaches, they told him not to go to a doctor. (*Id.* at 150).[4]

Finally, Chisholm alleges that Frye "retaliated against" him for challenging his authority or disagreeing with him and for making mistakes. By way of example of Frye's would retaliate by, at times, by telling the team to run hills or "take a mile" (*id.* at 185-87), in response when Chisholm: questioned full-contact hitting at practice without full gear (*id.* at 180); responded sarcastically when Frye called another player "pussy" (*id.* at 184-86); and mistakenly told the team practice would be "no helmets" (*id.* at 184-87).

Chisholm did not complain to his parents or school administrators about Frye while playing for him. (*Id.* at 188-89).

On October 23, 2015, Chisholm's teammates voted to remove him from the football team. (*Id.* at 62; Doc. 37 at 138-139). The vote followed the second-to-last game of the season; the team apparently believed that Chisholm tried to "throw" the game. (*See* Doc. 35 at 119-20, 168). Frye allowed the team's decision to stand, but it is unclear whether he affirmatively approved it. (Doc. 33 at 65 ("[Frye] spoke with the team captains before they [voted], so… When they requested to have me removed from the team, he was the one that gave the go.")).

---

[4] Chisholm testified about two injuries: a broken hand and knee pain. The hand injury occurred in the Summer of 2014, when Chisholm punched a pole out of frustration during a weightlifting event. (Doc. 33 at 98-99). An assistant coach looked at the hand and determined Chisholm broke it. (*Id.* at 101-02). Chisholm testified that Frye and other coaches told him he could either play with the injured hand or lose his starting position. (*Id.* at 101-04). For fear of losing his starting role, Chisholm chose not to pursue further medical treatment. (*Id.* at 107). As to his knees, Chisholm could not identify a specific injury but attributed his knee pain to "strenuous activity and no rest and disregard for the injury of my legs." (*Id.* at 92). He reported his knee pain to assistant coaches "several times", and, "[a]bout 90 percent of the time", they did not recommend further treatment. (*Id.* at 95). They did send him to the trainer "[a] few times" but, according to Chisholm, "[i]t was very clear by [the trainer's] actions and the steps that she took was to get you back on the field as quick as possible sometimes disregarding the actual injury itself." (*Id.*).

Chisholm did not play in the last game of his senior year or attempt to rejoin the team. (Doc. 44-6 at 3, ¶¶ 11-14; Doc. 33 at 64).

The St. Marys Athletic Code of Conduct provides a process for addressing athlete misconduct. The process has three steps: 1) an investigation into the accusation; 2) a determination whether the accusation has merit and of the offense's severity; and 3) written notice to the student and the student's parents notifying them of the penalty and the student's right to appeal. (Doc. 35 at 176-77; Doc. 35-5 at 43-44). There is no procedure in the Athletic Code of Conduct for voting a player off a team. (Doc. 35 at 142-43).

Hollman and Frye discussed Chisholm's removal, and Frye confirmed that the team voted for it. (*Id.* at 139-40). Hollman did not further investigate Chisholm's removal or notify Chisholm of an appeal right. (*Id.* at 177-78). He testified that he did not followed the procedure outlined above in response to any other student misconduct. (*Id.* at 178).

### C. Chisholm Reports Frye's Behavior

After his removal from the football team, Chisholm complained to his father, Joshua Chisholm, about Frye's behavior. (Doc. 37 at 24).

After Chisholm voiced his concerns, the father called the school principal to question Chisholm's removal from the team. When asked if he wanted to make a formal complaint at that time, the father declined. (*Id.* at 26-27). He then contacted Reid Lininger's father, who revealed that Frye "embarrass[ed Lininger]" and "treated him unfairly and disrespectfully." (*Id.* at 29).

Believing other team members might have similar experiences, Chisholm's father developed a questionnaire to "corroborate [Chisholm's] story." (*Id.* at 24). He gave Chisholm the questionnaire and instructed him to ask team members to complete and sign it. (*Id.* at 25, 37-38). Chisholm collected four responses and wrote his own response. (*Id.* at 36).

Soon after Chisholm supplied the questionnaire responses, his father contacted Hollman and complained about Chisholm's removal from the team. (*Id.* at 46-47).

In the meantime, Chisholm's father met with Lininger's father and other parents about Frye. (*Id.* at 55-56). They decided to contact an attorney, who prepared a letter complaining about Frye to Brown and Hollman. (Doc. 37 at 55).

### 1. The December, 2015 Complaints

The letter, dated December 18, 2015, complained that "Doug Frye and his staff members have harassed, intimidated and hazed student athletes." The letter asked the Board to investigate Frye and "remove [him] and his staff from coaching and teaching." (Doc. 34-1). Chisholm and Lininger's fathers signed the letter. (*See id.*).

On December 22, 2015, Brown and Hollman met with the fathers and their attorney. At the meeting, the fathers presented Brown with the questionnaire responses from Chisholm and the other three students. (Doc. 37 at 47).[5] The students' responses complained that Frye called them and their teammates names, including "bitch," "asshole," "pussycake," "cancer," "dumbass," "douchebag," and "idiot loser." They also complained that Frye ignored injuries and claimed that concussions are not real, encouraged players to fight one another, and sometimes required full-contact practice without pads. (Doc. 34-1 at 2-7).

Brown advised Frye about the complaints against him and disclosed to him the names of the complaining parties. (Doc. 40 at 213-14).

Around the same time that the fathers submitted their complaint to the Board, they also sent a complaint about Frye to the Ohio Department of Education (ODE). (Doc. 34 at 172).

---

[5] I collectively refer to the fathers' letter and the students' questionnaire responses as the December, 2015 complaints.

## 2. The Board's Investigation and Results

On receiving the complaints, the Board began an investigation. On its attorney's recommendation, the Board hired Ted Knapke, Ph.D. to lead the investigation. The attorney chose Dr. Knapke, a former school superintendent and former director of the Education Service Center, which put on programs for aspiring superintendents and collaborated on strategic planning with school districts. The attorney recommended Dr. Knapke because he had done a school investigation for another lawyer at the attorney's firm. (Doc. 55 at 15-16; Doc. 40 at 191-92).

After developing a set of interview questions, Dr. Knapke interviewed eleven players, some of their parents, and "the team doctor, the team trainer, and most of the coaches."[6] (Doc. 55 at 15; *see also* Doc. 45-6 at 7). Among other players, Dr. Knapke interviewed Chisholm, whose father accompanied him at the interview. (Doc. 37 at 297).

### a. The Investigator's Findings and Recommendations

Dr. Knapke summarized his two-day investigation in a January 27, 2016 report. (Doc. 45-6 at 7-12). He explained that the allegations against Frye, if true, would warrant "significant changes in the program/personnel." He concluded, however, that "[t]he investigation clearly did not bear out the allegations." (*Id.* at 12).

Indeed, Dr. Knapke explained, "the interviews of the eight students who did not submit [questionnaire responses] and those members of the coaching staff did not corroborate the allegations in the [responses]." (*Id.* at 11). Specifically, he found that "[b]oth coaches and students acknowledge that . . . swearing does occur at times, however, there is no evidence that

---

[6] Knapke's report notes that he interviewed eleven athletes: the three who completed the questionnaire and eight who did not. (*See* Doc. 45-6 at 7).

it is out of line by most standards." (*Id.*). He also explained that his interviews with the team doctor and trainer and parents of injured players confirmed that the coaches properly administered the injury protocol. (*Id.*).

Dr. Knapke ended his report with two recommendations: 1) the coaching staff should "[c]ontinue to communicate the injury protocols . . . with players and parents from the very start of the season" and (2) Hollman should "remain closely involved with" the football program." Specifically, Dr. Knapke recommended that Hollman learn players' concerns and proactively address potential problems. (*Id.*).

### b. Community Backlash

Shortly after the investigation, Frye's then-attorney posted Knapke's report to a Facebook page for St. Marys football players' parents. The attorney identified the two fathers as the complaining parties and noted that they had filed a complaint with the ODE. (*See* Doc. 52 at 25-28; 52-2 at 11). It is not clear from the record how the attorney accessed the report, whether pursuant to a public records request or otherwise. (*See* Doc. 40 at 222 (Q: Did you [Brown] give that [report] to [Frye's attorney]? A: I did not directly give it to him. He might have done a records request, I don't know.).

Seeing this, some of the page's members posted insulting comments about Chisholm, the other complaining players, and the fathers. (Doc. 37 at 149-60 (citing Doc. 37-1 at 8-45 (screenshots of Facebook comments on St. Marys football parents page referring, for example, to students as "little ass holes" and the fathers as "idiots")). Some posters included school district employees, such as a keyboarding instructor[7] and school nurse. (*See*, *e.g.*, Doc. 37-1 at 25, 38; *see also* Doc. 40 at 224, 230-31).

---

[7] The keyboarding instructor is also Frye's wife. (*See* Doc. 40 at 230-31).

### c. Appeal to the Board

In a letter to Brown dated February 8, 2016, the complaining students[8], their parents, Dave Lininger, and one additional student appealed the investigation results. (*See* Doc. 51-2).

The letter complained about Dr. Knapke's interviews, including their length and the questions asked, and Dr. Knapke's failure to consider Frye's disciplinary history. The letter also complained of the community backlash. (*Id.*). The letter to Brown did not reference the St. Marys Anti-Harassment Policy (Harassment Policy), about which Chisholm now separately complains, because Dr. Knapke had failed to apply it. (*See* Doc. 50-4; Doc. 64 at 15).

Brown shared the appeal letter with the Board. One Board member suggested conducting a second investigation. No such investigation occurred. (Doc. 40 at 185-89).

### 2. The ODE's Findings

The ODE concluded its investigation in a letter dated April 27, 2017. The letter stated that the ODE "determined that no disciplinary action will be pursued." (Doc. 45-6 at 6).

### D. Chisholm Graduates and Joins the Army

Chisholm completed his senior year. He competed on the wrestling team that winter (Doc. 33 at 134) and graduated on May 29, 2016. (Doc. 1 at 6, ¶ 16).

While a junior, Chisholm had signed up for the U.S. Army's Delayed Entry Program. (Doc. 44-1 at 92-93; Doc. 44-7). After his graduation, he became actively enlisted in the Army and served in Afghanistan as a paratrooper. (*Id.* at 30-31, 39).

---

[8] Here, the complaining students include one additional student who submitted a questionnaire response after the December 22 meeting. That student's parents did not join the appeal. (*See id.*).

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

The burden then shifts to the nonmoving party to "set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Analysis

## A. Title IX

Chisholm claims that the Board violated his rights under Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§1681, *et seq.* He alleges that he suffered; 1) sexual harassment based on gender stereotypes; and 2) retaliation for participating in Title IX-protected activity.[9]

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

---

[9] Chisholm also alleged that the Board discriminated against him by handling his complaint against Frye differently than a female student's complaint. (Doc. 1 at 30, ¶ 122). The Board points out that Chisholm has not produced any evidence to support this claim (Doc. 43 at 21), and Chisholm does not even reference that claim in his brief. (*See* Doc. 64). I therefore grant summary judgment on that claim. *See Campbell v. Hines*, 2013 WL 7899224 (6th Cir.).

## 1. Sexual Harassment

To establish a Title IX claim for sexual harassment, Chisholm must show:

> (1) that the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive [him] of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment.

*Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444-45 (6th Cir. 2009) (internal citations omitted); *see also Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 366-67 (6th Cir. 2005) (explaining deliberate indifference standard applicable to peer harassment cases applies in teacher-on-student harassment cases) (citing *Gebser v. Lago Valley Indep. Sch. Dist.*, 524 U.S. 629 (1999); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)).

Proving sexual harassment is a two-step process. First, "the student [must show] harass[ment] on the basis of his or her sex." *Tumminello v. Father Ryan High Sch., Inc.*, 678 Fed. App'x 281, 284 (6th Cir. 2017). Second, the student must show that the "harassment [was] so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 634 (1999); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998) (explaining two-step sexual harassment inquiry).

The Board argues that Chisholm did not suffer harassment based on his sex. (*See* Doc. 43 at 14-15). Chisholm responds that Frye harassed him because he did not conform to male stereotypes. (*See* Doc. 64 at 21-24).

I agree with the Board that Chisholm did not suffer sex-based harassment.

"[H]arassment or stereotyping based on a person's gender non-conforming behavior is impermissible discrimination." *Tuminello*, *supra*, 678 Fed. App'x at 284 (citing *Price*

*Waterhouse v. Hopkins*, 490 U.S. 228, 250-51(1989)).[10] To succeed on a sex-stereotyping theory Chisholm must show that he "did not conform to traditional gender stereotypes in an observable way and that these characteristics were the basis of his harassment." *Id.* at 285-86 (citing *Price Waterhouse*, *supra*, 490 U.S. at 764-65); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764 (2006).

Chisholm claims that Frye deliberately used terms like "pussy" and "bitch" to target "stereotypically feminine characteristics" (*see* Doc. 64 at 23; Doc. 33 at 157) and re-enforce "traditional notions of masculinity" (*see* Doc. 1 at 14, ¶ 51). He produces no evidence, however, indicating he exhibited gender non-conforming characteristics.

At best, Chisholm shows that Frye sometimes perceived him as weak. *See Doe v. Torrington Bd. of Educ.*, 179 F. Supp. 3d 179, 197 (D. Conn. 2016) (explaining that courts "have found that the terms 'pussy' . . . and 'bitch' are also insufficient to suggest that a student was harassed on the basis of gender"); *see also Oncale*, *supra*, 523 U.S. at 81 ("[Plaintiffs] must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimination* because of sex.'"). Subjective perceptions alone cannot form a gender-stereotyping sexual harassment claim. *See Vickers*, *supra*, 453 F.3d at 763 (finding plaintiff did not suffer sex-based harassment despite his claim that his coworkers called him names like "fag" and "gay" because they perceived him as preferring "traditionally female- or less masculine" relationship roles); *see also Seamons v. Snow*, 84 F.3d 1226, 1233 (10th Cir. 1996) ("The qualities Defendants were promoting, team loyalty and toughness, are not uniquely male.").

---

[10] Courts regularly consult Title VII sex-discrimination jurisprudence for guidance in Title IX cases. *See, e.g.*, *Tuminello*, *supra*, 678 Fed. App'x at 284.

Further undermining Chisholm's claim, Frye regularly called other team members "pussy" and "bitch." (*See*, *e.g.*, Doc. 38 at 138 (L. Ginter); (Doc. 39 at 260 (R. Lininger)). Frye's insult on an equal opportunity basis: he spray-shot his name-calling randomly at anyone or, sometimes, at the whole team, not focusing only on Chisholm. (*See* Doc. 33 at 157, 192-93). His words did not single out Chisholm for unique, observable, gender non-conforming characteristics.

Because Chisholm has not shown that Frye harassed him based on his sex, his claim for Title IX sexual harassment fails.

## 2. Retaliation

Chisholm also claims that the Board retaliated against him for exercising his Title IX rights.

Title IX protects individuals who "complain of sex discrimination" from retaliation. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005). To demonstrate Title IX retaliation Chisholm

> [M]ust show that (1) he engaged in protected activity, (2) [the Board] knew of the protected activity, (3) he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action.

*Gordon v. Traverse City Area Pub. Schs.*, 868 Fed. App'x 315, 320 (6th Cir. 2017) (internal citation omitted).

The Board argues that Chisholm did not engage in protected activity. Rather, the Board argues, Chisholm merely lodged a general bullying complaint against Frye. (Doc. 43 at 17-18). Chisholm argues that the complaint had a "reasonable basis," earning Title IX's protections. He further argues that Title IX protects his complaint because it should have triggered an

investigation pursuant to the Harassment Policy. (Doc. 64 at 39-40) (citing Doc. 50-4 (the Harassment Policy))).

I agree with the Board that Chisholm did not engage in protected activity.

"[A] vague charge of discrimination . . . is insufficient to constitute" Title IX-protected activity. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.3d 1304, 1313 (6th Cir. 1989) (explaining that plaintiff's letter complaining of "ethnocism" was not protected activity in race discrimination case).

Courts in this circuit have declined to protect complainants if they do not adequately describe the nature of the alleged legal violation. For example, an employee's letter complaining that "she felt discriminated against and that 'all her team members were younger and some were male'" was not protected activity in an age and sex discrimination case. *See McKinley v. Skyline Chili, Inc.*, 2012 WL 3527222, *9-10 (S.D. Ohio). Likewise, an employee's verbal complaints that he suffered "discriminatory" discipline and that he felt "harassed" and "treated differently" were merely "vague protests." *Pastura v. CVS Caremark*, 2012 WL 6738660, *10 (S.D. Ohio); *see also Porubsky v. Macomb Cmty. Coll.*, 2012 WL 280375, *10-11 (E.D. Mich.) (student's complaint that school treated him differently than similarly performing female classmates not protected activity where complaint did not mention gender discrimination).

In their letter to Brown and Hollman, Chisolm and Lininger's fathers complained generally of harassment. (*See* Doc. 34-1 at 1). Chisholm and his teammates' questionnaire responses complained of name-calling, including Frye's use of the term "pussy," and "bullying."[11] (*Id.* at 3-6). But the letter and questionnaire responses do not mention sex at all,

---

[11] Chisholm's and his teammates' statements also complained about other conduct, such as ignoring injuries and encouraging fighting, that Chisholm does not allege is sex harassment. (*See* Doc 34-1 at 2-7).

much less the students' Title IX rights. Such general complaints of harassment do not earn Title IX protection. Chisholm therefore fails to meet the first element of his retaliation claim.[12]

### B. Constitutional Claims

Chisholm raises constitutional claims under 42 U.S.C. § 1983 against all defendants. Section 1983 provides a claim for relief against individuals who, acting "under color of" state law, violate a plaintiff's federal constitutional or statutory rights.

Chisholm alleges that the individual defendants denied him equal protection and that all defendants violated his substantive due process rights. He also claims that the Board should be liable under *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978). Likewise, he claims that Brown and Hollman should be liable for Frye's conduct as his supervisors.

For the reasons stated below, I find that Chisholm has not demonstrated a genuine issue of material fact as to the constitutional claims' merits. I therefore need not determine the Board's *Monell* liability or Brown and Hollman's supervisory liability. *See Doe v. Claiborne Cty., Tenn. ex rel. Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 505 (6th Cir. 1996) (explaining "[t]he threshold determination" *vis-à-vis* supervisory liability "is whether [a defendant's conduct] amounts to a constitutional violation"). Nor do I determine whether the individual defendants enjoy qualified immunity from Chisholm's claims.

### 1. Chisholm's Equal Protection Claim Fails Because He Did Not Suffer Discrimination Based on His Sex

"To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected

---

[12] In his complaint, Chisholm complains that Frye "retaliated" against him by making him run hills, yelling at him, and so on. He does not, however, raise a retaliation cause of action (pursuant to Title IX or otherwise) against Frye for that conduct. (*See* Doc. 1 at 4-5, ¶ 12).

class." *Jachyra v. City of Southfield*, 97 F.3d 1452, 1996 WL 520795, *3 (6th Cir.) (quoting *Henry v. Metro. Sewer Dist.*, 922 F.3d 332, 341 (6th Cir. 1990) (internal quotations omitted)). To prove his equal protection claim, Chisholm "must state a prima facie case of sex discrimination." *Id.*; *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 794-95 (6th Cir. 2000).

The Board, Brown, and Hollman argue that Chisholm's equal protection claim fails because he has not shown that "any alleged act or omission by defendants was based upon his gender." (Doc. 43 at 23). Similarly, Frye argues that Chisholm has not shown that he is a member of a protected class. (Doc 44 at 25-28).

In accordance with my above analysis, I agree with the Board, Brown, and Hollman that Chisholm has not shown that he suffered sex-based harassment. Moreover, he has not alleged that he suffered discrimination based on any other protected characteristics. Accordingly, Chisholm's equal protection claim, like his Title IX claim, fails. *See Morris*, *supra*, 201 F.3d at 794-95 (affirming dismissal of § 1983 equal protection claim where plaintiff failed to prove Title VII sex harassment).

### 2. Chisholm's Substantive Due Process Claim Fails Because He Has Not Shown Defendants' Conduct Shocks the Conscience

"Substantive due process is 'the doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1216 (6th Cir. 2002)). "There are two types of substantive due process claims: 1) deprivations of a particular constitutional guarantee; and 2) actions that 'shock the conscience.'" *Blythe v. Schlievert*, 245 F. Supp. 3d 952, 956 (N.D. Ohio 2017) (Carr, J.) (quoting *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997) (internal quotations and additional citation omitted)).

Apparently attempting to proceed under both theories, Chisholm cites "the right to be free of invidious sex discrimination at the hands of the state" in his briefs. (Doc. 64 at 44; Doc. 65 at 15 (quoting *Claiborne Cty. ex rel. Claiborne Cty. Bd. of Educ.*, 103 F.3d at 506 (internal quotations omitted)). But he raised only a shock-the-conscience claim in his complaint.[13] (Doc. 1 at 26-27). *See Braley v. City of Pontiac*, 906 F.2d 220, 225-26 (6th Cir. 1990) (evaluating only shock-the-conscience claim where "complaint allege[d] no violation of a specific constitutional guarantee"); *Blythe*, *supra*, 245 F. Supp. 3d at 957 (same) (citing *Rochin v. California*, 342 U.S. 165, 211 (1952)). I therefore determine only whether Chisholm's shock-the-conscience claim can survive summary judgment.

"The 'shocks the conscience' standard is difficult to satisfy. To shock the conscience, the conduct must be 'so egregious' that it can be said to be 'arbitrary in the constitutional sense.'" *Blythe*, *supra*, 245 F. Supp. 2d at 957 (internal quotations omitted) (quoting *Ewolksi v. City of Brunswick*, 267 F.3d 492, 510 (6th Cir. 2002)). "Conduct shocks the conscience if it 'violates the decencies of civilized conduct.'" *Range*, *supra*, 763 F.3d at 589 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)). "Such conduct includes actions 'so brutal and offensive that they do not comport with traditional ideas of fair play and decency.'" *Id.* at 589-90 (internal citations omitted).

To determine whether defendants' conduct meets this standard, I evaluate the totality of the circumstances. *Range*, *supra*, 763 F.3d at 591.

---

[13] Moreover, and as explained previously, Chisholm did not suffer from sex discrimination.

## a. Chisholm Does Not Identify a Physical Injury Defendants Caused

The Sixth Circuit generally "resist[s] application of the 'shocks the conscience' standard to § 1983 cases not involving physical force. *Callihan v. Sudimack*, 117 F.3d 1420, 1997 WL 1420, *3 (6th Cir.).

Defendants argue that, because Chisholm suffered no physical injury, I should dismiss the substantive due process claim. Chisholm responds that no such injury is necessary here because, he claims, defendants acted intentionally and with deliberate indifference.[14] (Doc. 64 at 43-44). I disagree.

First, Chisholm provides no authority that defendants' allegedly intentional conduct warrants setting aside the usual physical injury requirement. Second, the Sixth Circuit has explained that intentional conduct does not always "rise to the level of a constitutional violation." *Braley*, *supra*, 906 F.2d at 226.

Notwithstanding the lack of a physical injury, Chisholm has not identified conscience-shocking conduct.

## b. Frye's Conduct Does Not Shock the Conscience

Chisholm, citing Title IX authority, argues that Frye's "harassment" shocks the conscience. He claims that a series of factors, such as Frye and Chisholm's coach-student relationship, demand such a finding. (Doc. 65 at 17 (citing U.S. Dep't of Educ., *Revised Sexual Harassment Guidance*, 6-7; *Davis*, *supra*, 526 U.S. at 653)).

Critically, the "shocks the conscience standard" does not apply in Title IX cases. Chisholm admits as much in his brief. (*See* Doc. 65 at 15). Moreover, though the factors

---

[14] Chisholm does not argue that his hand and knee injuries resulted from conscience-shocking conduct. I therefore decline to discuss whether Frye's allegedly callous approach towards injuries violated Chisholm's constitutional rights. (*See* Doc. 65 at 15-18).

Chisholm cites are relevant to my analysis, the totality of the circumstances indicates Frye's conduct does not shock the conscience.

Chisholm points to only Frye's insults as the basis of his substantive due process claim against Frye. But courts resist finding a substantive due process violation based on insults alone. *See, e.g.*, *L.H. v. Pittson Area Sch. Dist.*, 666 Fed. App'x 213, 217 (3d Cir. 2016) ("[V]erbal abuse is normally not a constitutional violation[.]") (internal quotations and citation omitted); *Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1258 (10th Cir. 1996) ("[E]ven extreme verbal abuse typically is insufficient to establish a constitutional deprivation.") (internal citation omitted).

In *L.H.*, *supra*, a teacher verbally insulted plaintiffs' thirteen-year-old son, telling him to "shut up," that she "[couldn't] stand him," that the student would "have the worst year ever", and suggesting he had Tourette's Syndrome. *Id.* at 215. The Third Circuit, affirming summary judgment for the school district, held that this conduct did not shock the conscience. *Id.* at 217.

Even worse, in *Abeyta ex rel. Martinez*, *supra*, a teacher called a twelve-year-old girl a prostitute in front of her class, asked the class if they thought the student was a prostitute, and continued to call her a prostitute over one and one-half months. The court, reversing a summary judgment denial, explained those "actions. . . do not reach the [conscience-shocking] level— whether they were done with indifference or deliberate intent to cause psychological harm." *Id.* at 1258.

Here, Chisholm endured Frye's insults as an upperclassman on his high-school varsity football team. He interacted with Frye on the practice and playing field in an ultra-competitive, highly physical sport, not in the nurturing classroom environment. Considering this context, I find that Frye's language does not shock the conscience.

### c. The Remaining Defendants' Conduct Does Not Shock the Conscience

Chisholm claims the remaining defendants' response to the December, 2015 complaints violated his substantive due process rights.

Chisholm bears the burden to show that the defendants' conduct was "inspired by malice or sadism . . . amount[ing] to a brutal and inhumane abuse of official power literally shocking to the conscience." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (internal citations omitted). He has not pointed to any evidence of malice.

Brown and the Board relied on Board counsel to engage a competent independent investigator in response to the complaints. They engaged Dr. Knapke, a Ph.D-educated former superintendent with at least some investigation experience, on counsel's recommendation. The Board and Brown then relied on Dr. Knapke, working with their counsel, to conduct a full investigation. Dr. Knapke went on to interview players, parents, coaches, and team medical staff. Even if Dr. Knapke's investigation was imperfect (for example, by asking the wrong questions), selecting him and trusting his expertise (including by denying the appeal) does not shock the conscience.

Chisholm deems the failure to provide Dr. Knapke the Harassment Policy for the investigation conscience-shocking, yet the appeal letter does not complain about that failure. Likewise, Dr. Knapke concluded that the students' complaints did not accord with the interview results, not that harassment did or did not occur as that term is defined in the Harassment Policy. I therefore do not agree with Chisholm that failing to provide Dr. Knapke the Harassment Policy shocks the conscience.

Moreover, even if the Board should have hired a different investigator, given him or her the Harassment Policy, or required a more exhaustive investigation, Chisholm has not shown

malice. At best, he complains of an imperfect, negligent, investigation. Negligence is not conscience-shocking. *See Braley*, *supra*, 906 F.2d at 226 (explaining negligence does not result in a substantive due process violation).[15]

Similarly, Chisholm argues that Hollman's failure to investigate Chisholm's removal from the football team shocks the conscience. I disagree. First, Hollman did discuss the removal with Chisholm's father and with Frye. Second, Hollman knew Chisholm had disciplinary issues and therefore found his removal, though unusual in method, unsurprising.

Further, Hollman did not provide other athletes the appeal rights that Chisholm complains Hollman denied him. This even-handed approach does not show malice toward Chisholm.

Finally, Chisholm argues that the Board violated his due process rights when it rehired Frye despite his disciplinary history and its post-hiring failed to monitor him. This argument is unfounded.

Frye was a successful coach and what St Mary's appeared most to want for its school. True, his disciplinary history contained complaints about his behavior, and even a criminal complaint. But his record also contained recommendations from the districts that handled those complaints and a state Coach of the Year Award. While the Board (and Brown) might have

---

[15] Chisholm also complains that "Brown was apparently unaware that he was prohibited from releasing parents' names to third parties or from discussing a harassment complaint." (Doc. 64 at 46). He does not explain how this lack of awareness violated his due process rights. Moreover, Brown disclosed the names to Frye to notify him of the nature of the allegations against him, and nothing in the record indicates Brown disclosed the names to the public directly. (Doc. 40 at 222 ("[Frye's attorney] *might have* done a records request, I don't know.") (emphasis added)). I therefore do not find that Brown's decision to disclose the complaining parties' identities shocks the conscience.

investigated Frye's record further, Frye's hire does not shock the conscience in light of his reputation for success.

Moreover, Brown, a Board member, and Hollman, Frye's supervisor, both monitored Frye. (Doc. 40 at 57). That the Board did not meet the level of supervision Chisholm would have liked does not shock the conscience.[16]

I therefore find that the Board, Brown, and Hollman did not violate Chisholm's due process rights.

### c. State Law Claims

In his complaint, Chisholm raises common law claims against all defendants: 1) gross negligence, bad faith, reckless, wanton and intentional conduct; 2) intentional infliction of emotional distress (IIED); and 3) negligent infliction of emotional distress (NIED). He also raises a claim of negligent hiring, supervision, and retention against the Board (for brevity, the negligent hiring claim).

### 1. Chisholm Fails Adequately to Address the Board's Immunity from His Negligent Hiring Claim

The Board argues that it is immune from Chisholm's state law claims under Ohio Revised Code § 2744.02.

Section 2744.02 grants political subdivisions immunity, subject to certain exceptions, from suits for "injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." *Id.* at § 2744.02(A)(1).

_____

[16] I also note that, in light of my finding that Frye's conduct did not shock the conscience, it would be illogical to conclude that his hire and supervision (or lack thereof), which led to that conduct, shocks the conscience.

The Board argues that "[t]here is no exception to immunity for negligent hiring, supervision or retention of an employee." (Doc. 43 at 33). Chisholm does not respond to this argument.[17] (Doc. 64 at 55 ("Plaintiff submits that there are genuine issues of material fact that preclude summary judgment on Counts I-VI and Counts VII and IX, excluding Count VII (for Negligent Hiring asserted against the Board of Education)).

In *Campbell v. Hines*, 2013 WL 7899224 (6th Cir.), the defendant argued that qualified immunity barred the plaintiff's equal protection claim. The plaintiff failed to address the qualified immunity argument in its response, so the Sixth Circuit affirmed summary judgment on that claim. *Id.* at *4. For the same reason, I grant summary judgment on Chisholm's negligent hiring claim.[18]

## 2. Ohio Law Does Not Create Standalone Claims for Gross Negligence, Bad Faith, Reckless Wanton, and Intentional Conduct

Chisholm claims that the defendants violated his rights under Ohio Revised Code § 2744.03.

Section 2744.03 does not create a standalone claim. "[W]illful, wanton, and reckless conduct is not a distinct cause of action."[19] *Bradley v. City of Cleveland*, 2012 WL 775106, *3 (N.D. Ohio) (Boyko, J.) (citing *Griggy v. Cuyahoga Falls*, 2006 WL 173134 (Ohio App.) (internal quotations omitted); *see also Brown v. Whirlpool Corp.*, 996 F. Supp. 2d 623, 643

---

[17] Chisholm, in a footnote, concedes that the Board is immune from his state law claims. While it appears he concedes immunity as to the negligent hiring claim, his reference to that claim in the header of that section of his brief creates an appearance that he is preserving that claim. (*See* Doc. 64 at 52). I therefore analyze the Board's immunity argument as to that claim.

[18] I also grant summary judgment for the Board on the remaining state law claims, as Chisholm has conceded the Board is immune from those claims.

[19] Such conduct may, however, create an exception to immunity. *Bradley*, *supra*, 2012 WL 775106 at *3.

(N.D. Ohio) (Carr, J.) (quoting *Cincinnati Ins. Co. v. Oancea*, 2004 WL 1810347 (Ohio App.)). I therefore deny summary judgment on this claim.

### 3. The State Law Claims Against Frye Fail

Frye argues that no genuine issue of material fact exists respecting the IIED and NIED claims against him. I agree.

### a. IIED

To succeed on an IIED claim, a plaintiff must show:

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio App. 1995).

Frye argues that his conduct was not extreme and outrageous. (Doc. 44 at 34). Chisholm, in response, argues that "application of context is crucial." (Doc. 65 at 25). He claims that Frye's disciplinary record, coupled with his role as a high school coach overseeing minor players, makes his conduct "extreme and outrageous." (*Id.*). I agree with Frye.

Ohio courts look to the Restatement (Second) of Torts § 46 for guidance on IIED claims. *See Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666, 671-72 (Ohio 1983). Comment d. to that section explains that "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."

In *Teare v. Independence Local School District Board of Education*, 2011 WL 463322, *12 (N.D. Ohio) (White, M.J.), the court denied summary judgment on an IIED claim when a

teacher told her thirteen-year-old pupil that her "family is going to hang from in the front yard as the city cheers as your bodies burn."

Conversely, here, none of the insults Chisholm cites threatened his or his family's safety. Likewise, the context (which Chisholm says I should consider) does not indicate Frye's conduct was outrageous (just as it did not indicate Frye's conduct shocks the conscience). Frye directed vulgar language toward a varsity upperclassman on the football field and in the locker room, not toward a young girl in the classroom. Accordingly, his language does not rise to the level of extreme and outrageous conduct.[20]

I therefore grant summary judgment on the IIED claim against Frye.

### b. NIED

> To make out a claim for negligent infliction of emotional distress ("NIED") under Ohio law, a plaintiff must show that: (1) the plaintiff was in fear of a real, imminent, physical danger; (2) the physical danger was caused by the defendant; (3) the plaintiff's apprehension of this danger caused the plaintiff to suffer emotional distress; (4) the emotional distress suffered by the plaintiff was reasonably foreseeable; and (5) the emotional distress suffered by the plaintiff was "both severe and debilitating," meaning that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."

*Walker v. Crawford*, 1999 WL 33917846, *5 (N.D. Ohio) (O'Malley, J.).

Ohio law "limit[s] recovery for negligent infliction of emotional distress to instances where the plaintiff has either witnessed or experienced a dangerous accident or appreciated the actual physical peril." *Heiner v. Moretuzzo*, 652 N.E. 2d 664, 669 (Ohio 1995).

Frye argues that Chisholm cannot meet the first element "because the alleged physical danger was not real or imminent unless every student voluntarily participating in high school

---

[20] Chisholm does not cite Frye's approach to injuries in his IIED argument, so I do not consider whether that conduct was extreme and outrageous. (*See* Doc. 65 at 24-25).

sports in which injury <u>could</u> occur qualifies." (Doc. 44 at 35). Chisholm responds that he need not "show a contemporaneous physical injury in order to establish a claim for NIED." (Doc. 65 at 26).

Chisholm mischaracterizes Frye's argument. That Chisholm suffers emotional distress (*see* Doc. 65 at 26 (citing Doc. 56-2 (psychological evaluation of Dane Chisholm)) supports the fifth element of his NIED claim. *See Walker*, *supra*, 1999 WL 33917846 at *5. Chisholm does not, however, argue, or even allege, that Frye's conduct made him fear "a real, imminent, physical danger." *Id.* (*See* Doc. 1 at 32-33, ¶¶ 138-41). Accordingly, the first element his NIED claim fails, and I grant summary for Frye on that claim.[21]

### 4. Brown and Hollman Are Immune from the IIED and NIED Claims

Brown and Hollman do not dispute, though, like Frye, perhaps they could have done so successfully, the merits of Chisholm's IIED and NIED claims. Instead, they argue that they are statutorily immune from those claims. (Doc. 43 at 33-35; Doc. 44 at 36-38). I agree.

Ohio law provides public employees immunity from civil suits, subject to certain exceptions. Ohio Rev. Code. § 2744.03(A)(6)(a)-(c). Immunity will not protect an employee where "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.* at § 2744.03(A)(6)(b).

Chisholm argues that Brown and Hollman acted with the culpability described in § 2744.03(A)(6). (Doc. 64 at 53-54).

Under Ohio law,

One acts with a malicious purpose if one willfully and intentionally acts with a purpose to cause harm. Malice includes the willful and intentional design to do injury, or the intention or desire to harm another through conduct which is

---

[21] In light of my findings on the merits of Chisholm's IIED and NIED claims, I decline to reach Frye's argument that he enjoys statutory immunity from those claims. (*See* Doc. 44 at 36-38).

> unlawful or unjustified. Bad faith is defined as a dishonest purpose, moral
> obliquity, conscious wrongdoing, or breach of a known duty through some
> ulterior motive or ill will. A person acts wantonly if that person acts with a
> complete failure to exercise any care whatsoever. One acts recklessly if one is
> aware that one's conduct creates an unreasonable risk of physical harm to another.
> Recklessness is more than mere negligence in that the person must be conscious
> that his or her conduct will in all probability result in injury.

*Spears v. Akron Police Dep't*, 2010 WL 625822, *4 (Ohio App.) (internal quotations and citations omitted); *see also Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 Fed. App'x 348, 359 (6th Cir. 2014) (quoting *id.*).

"[R]ecklessness is a perverse disregard of a known risk." *Shively*, *supra*, 579 Fed. App'x at 359 (quoting *O'Toole v. Denihan*, 889 N.E.2d 505, 517 (Ohio 2008)). "The question of recklessness turns on whether Defendants knew of and could foresee harm to a student and whether they took actions in response to the harassment." *Id.* at 359-60.

Chisholm, citing *Shively*, *supra*, argues that Brown and Hollman made a "deliberate decision not to enforce school policies against bullying," and they therefore are not immune from his claims.

The Sixth Circuit in *Shively* found that school administrators acted recklessly because they failed to respond to bullying complaints. The *Shively* plaintiff's daughter suffered bullying for years; her classmates called her names like "dirty Jew," told her to "rot in Hell," put her name on a "kill list," and stabbed her with a pencil, among other things. *See* 579 Fed. App'x at 350-51. But, when plaintiff complained to school administrators, they did nothing – and one even suggested her daughter "enjoyed the attention" – though a bullying policy required them to address the bullying. *Id.* at 358. Finding this "deliberate decision not to enforce school policies" was reckless, the court affirmed the district court's decision to deny immunity. *Id.* at 360.

Here, in contrast, Brown responded immediately to the December, 2015, complaints about Frye. *Cf. also Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, --- F. Supp. 3d ----,

2018 WL 4539440 (S.D. Ohio) (denying immunity to school administrators and staff who did not respond to complaints of bullying and who took no action despite witnessing a student slap the victim). Indeed, Brown relied on Board counsel to select a competent investigator, who went on to conduct two days of interviews and produce a report of his findings. Though Brown did not provide Dr. Knapke the Harassment Policy, Chisholm has not explained how this failure is "perverse." Indeed, Brown explained that he relied on Board counsel to ensure the investigation was adequate.

Likewise, Chisholm has not shown that Brown acted maliciously, in bad faith, wantonly, or recklessly when recommending Frye to the Board. First, I note that Chisholm has not raised a negligent hiring claim against Brown, and his argument about Frye's hire fits better in that type of claim. Next, as explained in my substantive due process analysis, Brown used the "known factor" when recommending Frye; he pursued Frye because of his prior successes. (*See* Doc. 40 at 102). Moreover, Brown did at least some investigation into the discipline in his record.

Finally, after the Board hired Frye, Brown and Hollman monitored him. (*See* Doc. 40 at 57). Brown's investigation and his decision to monitor Frye contradict Chisholm's argument that Brown perversely disregarded his safety.

Further, Chisholm's argument that Brown's failure to keep his identity in the December 2015 complaints confidential abrogates immunity is meritless. Brown provided Chisholm's name to Frye only, and he did so to inform him about, and give him fair notice of, the allegations against him. Further, Chisholm only speculates that Brown did not redact the complaining parents' names in response to Frye's attorney's hypothetical records request. (*See* Doc. 64 at 19 (explaining that "Brown thought [the attorney] *may have* obtained the [complaint] . . . by requesting public records from the school) (emphasis added)). But nothing in the record indicates

that any such request occurred or that Brown failed to redact confidential information in response to such a request.

Likewise, Chisholm's complaint that Hollman did not adequately address his removal from the team does not show § 2744.03(A)(6) culpability. Indeed, as explained above, Hollman did not follow the Athletic Code of Conduct procedure for rules infractions in any instance. At most, this even-handed approach is negligent, and negligence does not abrogate immunity under § 2744.03(A)(6). *See Riehm v. Green Springs Rural Volunteer Fire. Dep't*, --- N.E.3d ----, 2018 WL 4896391 (Ohio App.). Moreover, Hollman addressed the removal with both Chisholm's father and with Frye, and the Athletic Code of Conduct contains no procedures for a team's decision to remove a player. (*Id.* at 142-43).

Chisholm has not identified facts to overcome Brown and Hollman's statutory immunity. I therefore grant summary judgment on his state law claims against them.

## Conclusion

It is, therefore, ORDERED THAT

Defendants St. Marys City School District Board of Education, Shawn Brown, and James Hollman's motion for summary judgment (Doc. 43) and defendant Paul Douglas Frye's motion for summary judgment (Doc. 44) be, and the same hereby are, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge